**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| FAZILAT KAZEMINEZHAD,         ) | |
| Plaintiff,         ) | |
| VS.         )   | **NO. CV 15-5087-JD** |
| AGA SERVICE COMPANY, ET AL., ) | |
| Defendants.         ) | |

San Francisco, California
Wednesday, February 24, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
        THE EVANS LAW FIRM
        3053 Fillmore Street - Suite 236
        San Francisco, CA  94123
   BY: **INGRID M. EVANS, ATTORNEY AT LAW**
      **MICHAEL LEVY, ATTORNEY AT LAW**
      **YECHIEL TWERSKY, ATTORNEY AT LAW**

For Defendants:
        WINSTON & STRAWN, LLP
        333 S. Grand Avenue - 38th Floor
        Los Angeles, CA  90071
   BY: **GAYLE JENKINS, ATTORNEY AT LAW**

Reported By:    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                 Official Reporter

| | |
|---|---|
| 1 | **Wednesday - February 24, 2016**                                    **10:35 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** Calling CV 15-5087, Kazeminezhad, et al., |
| 5 | vs. AGA Service Company, et al. counsel. |
| 6 | **MS. JENKINS:** Good morning, Your Honor. Gayle Jenkins |
| 7 | on behalf of defendant moving party. |
| 8 | **MR. TWERSKY:** Your Honor, Michael Twersky on behalf of |
| 9 | plaintiffs, Fazilat Kazeminezhad and Brett Lashlee. |
| 10 | **MS. EVANS:** Good morning, Your Honor. Ingrid Evans |
| 11 | and Michael Levy on behalf of plaintiffs. |
| 12 | **THE COURT:** Kazeminezhad; correct?  Who is the |
| 13 | five-year person? |
| 14 | **MR. TWERSKY:** Me, Your Honor. |
| 15 | **THE COURT:** Welcome.  Is this your first one? |
| 16 | **MR. TWERSKY:** Yes, sir. |
| 17 | **THE COURT:** It's unfortunately going to be a little |
| 18 | bit of a rough ride, but that's okay.  But not for you |
| 19 | initially.  Actually, I'm going to talk to the defendants. |
| 20 | Let me ask the plaintiff one question.  So one of your |
| 21 | plaintiffs lives in Marin? |
| 22 | **MR. TWERSKY:** Yes. |
| 23 | **THE COURT:** I'm trying to figure out why we are here |
| 24 | in San Francisco.  There is a Marin County -- I'm sorry.  Mill |
| 25 | Valley. |

1        **MS. EVANS:** Strawberry.

2        **THE COURT:** Strawberry. Okay. All right.

3    Ms. Jenkins.

4        **MS. JENKINS:** Yes, Your Honor.

5        **THE COURT:** I am rather skeptical about this filed

6    rate issue. That's all we are going to talk about today. The

7    other ones I don't need argument on.

8        Let me ask you a question. The Ninth Circuit has said

9    that the Filed-Rate Doctrine doesn't apply to state rates and

10   state regulators, so why am I looking at this?

11       **MS. JENKINS:** Well, Your Honor, the cases that they

12   cited, I did not see a case that said that. The Filed Rate

13   Doctrine most recently was addressed by a California court, the

14   *MacKay* court, that --

15       **THE COURT:** The case is *E&J Gallow*. It's the Ninth

16   Circuit, 2007, and the Ninth Circuit held the Filed-Rate

17   Doctrine bars challenges under state law to rates set by

18   federal agencies. That has been applied in the federal courts

19   to mean that while you might have a federal argument, you don't

20   have a state rate argument.

21       So what case, what Ninth Circuit case says that the

22   Filed-Rate Doctrine applies? In this situation you're

23   challenging a California Department of Insurance rate; right?

24       **MS. JENKINS:** They're challenging a California --

25       **THE COURT:** But you're trying to sell me on the

1  Filed-Rate Doctrine.
2  **MS. JENKINS:** Yes.
3  **THE COURT:** So what case says the Filed-Rate Doctrine
4  applies in a case like that?
5  **MS. JENKINS:** The *MacKay* court.
6  **THE COURT:** *MacKay* is state --
7  **MS. JENKINS:** I understand that, Your Honor.  But we
8  are in diversity case, so the state law is the law we look to,
9  and if you're telling me, Your Honor, that the case maybe that
10 you're looking at is one where they were looking about whether
11 or not it applies to a federal cause of action, but we are
12 talking about state law causes of action here and therefore
13 state law applies.
14 **THE COURT:** What case says it?  You cited *MacKay*, but
15 what federal court does that?  I didn't see one.  I'm looking
16 at an opinion from Judge Illston, 2013, which was a challenge
17 to a California rate insurance claim under California state
18 law, and she held, the Ninth Circuit says it doesn't apply
19 here.
20 **MS. JENKINS:** I'm sorry, Your Honor --
21 **THE COURT:** Ninth Circuit has not said that the
22 Filed-Rate Doctrine applies in situations like this where the
23 regulators are state regulators, just like your case.
24    So, look, none of this was in anybody's briefing.  So I'm
25 feeling unbriefed because neither of you picked up on this,

1   which surprises me.
2           **MS. JENKINS:**  I apologize for that, Your Honor.
3           **THE COURT:**  As it stands now -- let me ask you another
4   question.  I also didn't see any allegation in there that this
5   travel insurance was an actual approved rate.
6           **MS. JENKINS:**  Well, Your Honor, the case law on
7   that -- and since plaintiffs didn't seem to challenge it, we
8   didn't address it is that --
9           **THE COURT:**  But it's your argument and --
10          **MS. JENKINS:**  Plaintiffs are --
11          **THE COURT:**  Don't talk over me.  Just stop when I
12  start.  I'm in the middle of trial.  I've got a million things
13  to do.  The briefing was poor, so you are just going to have to
14  do it my way.  Okay?
15      You have to show me that a doctrine applies.  The premise
16  of the doctrine factually is that the Department of Insurance
17  has approved a rate.  There is nothing in the Complaint, which
18  is the only operative document before me at this stage, that
19  says anything about this being an approved rate.
20      If it's not an approved rate, the factual predicate for
21  all this doesn't even fit, and you didn't offer me anything in
22  your briefs saying it's an approved rate.  And I don't know the
23  first thing about what the Department of Insurance does with
24  respect to travel policies.
25      Now, when and where did these policies get approval from

1   the Department of Insurance such that the factual predicate for
2   the application of the doctrine would apply?
3           **MS. JENKINS:**  Your Honor, they couldn't sell the
4   insurance to California insureds if it wasn't approved by the
5   California Department of Insurance.
6           **THE COURT:**  But when did that happen?  I don't know
7   that.  There is nothing cited in the briefs about that.  I
8   mean, you see what I'm saying?
9           **MS. JENKINS:**  Yes, I do, Your Honor.
10          **THE COURT:**  All right.  So now the third thing is I
11  don't understand why this is a 12(b)(1) issue.  The courts in
12  this district have expressed great skepticism that this is.
13  The Ninth Circuit has dealt with the Filed-Rate Doctrine as a
14  12(b)(6) substantive claim, not as a jurisdictional claim.
15      Why is this a 12(b)(1) issue?
16          **MS. JENKINS:**  Your Honor, we didn't want to waive the
17  argument that it was a 12(b)(1) issue.  Even though the courts
18  in this specific jurisdiction have not favored that argument,
19  there are ones outside of this district that have found it to
20  be a favorable argument, and we wanted to cite them as
21  persuasive, although not -- obviously not binding on this
22  Court.  And there is --
23          **THE COURT:**  That's fine, but just switching the decks
24  doesn't help me.  You have to explain to me why my colleagues
25  here were wrong.  I didn't see that.  What is wrong with

1    treating this as 12(b)(6) rather than 12(b)(1)?

2    **MS. JENKINS:** Your Honor, because as a matter in the
3    first -- one of the things that a plaintiff needs to establish,
4    that they have standing in bringing the claim in the first
5    place, and so --

6    **THE COURT:** That's true for all 12(b)(6) claims. All
7    you're saying is there is no jurisdiction because there is no
8    injury in fact because they don't have a claim. That argument
9    fits every 12(b)(6) *Twombly* motion. Everybody who comes into
10   this courtroom to argue *Twombly* and *Iqbal* to me says,
11   *Your Honor, they don't have a claim*. They don't then say, *And*
12   *you must dismiss this because there is no Article III*
13   *jurisdiction*. Nobody does that because you don't need to.

14     So why do I need to do that? Why is this jurisdictional?

15   **MS. JENKINS:** Your Honor, in the first instance, the
16   plaintiff doesn't have the right to come into this forum and
17   complain about a rate when that issue is before the California
18   Department of Insurance. That's why it's a standing issue in
19   the first instance.

20   **THE COURT:** Yes, but that's -- all you're saying is
21   they have no injury in fact. This was out of your brief. You
22   say they have no injury in fact because they don't have a
23   cognizable claim because the Filed-Rate Doctrine, in your view,
24   says they can only complain to the Department of Insurance.

25   **MS. JENKINS:** Yes, Your Honor.

1    **THE COURT:** How is that different from saying in any
2    case, a Section 1 antitrust case, *Your Honor, they don't have*
3    *standing because they don't have a claim because they haven't*
4    *adequately pled an agreement to fix prices.* That doesn't turn
5    it into 12(b)(1) motion.  That's just 12(b)(6).  You failed to
6    state a claim.
7    **MS. JENKINS:** Well, Your Honor, perhaps I felt a
8    little more protective of your jurisdiction than I should have
9    on this --
10   **THE COURT:** You don't need to protect my jurisdiction.
11   Federal jurisdiction polices itself, and I have a *sua sponte*
12   duty to administer that.  But we also have a duty to allow
13   people to come into court and state a claim and not say the
14   courthouse doors are closed under an argument that has no case
15   law support.
16   I'm just asking you which Ninth Circuit case says, *Judge,*
17   *you ought to treat this as a 12(b)(1) issue.*  I didn't see it.
18   You didn't cite one and we didn't find one.  Is there one?
19   **MS. JENKINS:** Apparently not, Your Honor.
20   **THE COURT:** Yes or no?  Do you know of one?
21   **MS. JENKINS:** No, Your Honor.
22   **THE COURT:** All right.  Okay.
23   **MS. JENKINS:** But I would like to, though,
24   Your Honor -- you indicated we weren't going to talk about
25   the --

1        **THE COURT:**  No.  The other ones are straightforward.
2     Mr. Levy or Twersky.
3        **MR. TWERSKY:**  Twersky, Your Honor.
4        **THE COURT:**  Mr. Twersky.  All right.  What do you
5  think about -- was this approved by the Department of
6  Insurance?  Do you dispute that?
7        **MR. TWERSKY:**  I must be honest, Your Honor, I think
8  the rate was approved by the Department of Insurance.  I mean,
9  I have seen the filing.  I did a little investigation,
10 obviously, before we filed.  But --
11       **THE COURT:**  Speak up a little bit.
12       **MR. TWERSKY:**  I think the rate was approved.  I don't
13 think that approval has anything to do with their obligation --
14       **THE COURT:**  Why is that?
15       **MR. TWERSKY:**  Well, the refund section, section of the
16 Code 481, is in a different chapter; in fact, it's in a
17 different part and it really has nothing to do with refunding a
18 part of a divisible premium, an entire section of coverage
19 really has nothing to do with the rate they charged.  The rates
20 are -- if I had coverage, if I buy a policy with more
21 coverage --
22       **THE COURT:**  Slow down.  Look at me when you talk.
23 Make eye contact with the judge.
24       **MR. TWERSKY:**  Sorry, Your Honor.
25    If they purchase -- if a person purchases a policy with

1   more coverages, for each coverage, they're going to end up
2   paying a little bit more.  It's nothing to do with the filed
3   rate here, my demanding -- or my asking for my clients for a
4   refund of part of the policy where the insurance company never
5   faced any risk.  It's a totally separate obligation, and I
6   think the insurance code, if anything, makes that clear because
7   the insurance code separates that out.  It's in a different
8   part of the code.
9              **THE COURT:**  What do you understand -- I mean, your
10  claim is, as I understand it, the putative class should have
11  had a refund opportunity after that ten-day contract period;
12  right?
13             **MR. TWERSKY:**  Correct, Your Honor.
14             **THE COURT:**  And based on some -- based on what?
15  Quasi contract?  I mean, let's switch gears for a second.
16      So you know unjust enrichment is not a cognizable claim.
17  It's a remedy, so --
18             **MR. TWERSKY:**  Yes, Your Honor.
19             **THE COURT:**  You're just sort of repackaging unjust
20  enrichment as quasi contract.  What does quasi contract add
21  other than the word *quasi contract* that's different from unjust
22  enrichment in this case?
23             **MR. TWERSKY:**  Well, I totally agree with Your Honor
24  that quasi contract in a sense is just another word for unjust
25  enrichment, but I do think the Ninth Circuit made it clear if

1    you couch it as a quasi contract claim -- in *Astiana vs. Hain*,
2    I think they made it pretty clear that a quasi contract claim
3    is a cognizable claim --
4            **THE COURT:**  How do you have a quasi contract claim
5    when your clients all had contracts?
6            **MR. TWERSKY:**  Because this portion -- this subject
7    matter was not addressed by the contract.  I mean, it did speak
8    about a satisfaction --
9            **THE COURT:**  Let's pause on that.  The contract says
10   for the first ten days, you get a refund.  And then after that,
11   you don't.  Why isn't that addressed by --
12           **MR. TWERSKY:**  Well, Your Honor, it doesn't say that
13   second part.  It says satisfaction guaranteed.  We guarantee we
14   will return your premiums within 10 days, period.
15           **THE COURT:**  Period.  Exactly.
16           **MR. TWERSKY:**  It would have been easy --
17           **THE COURT:**  On day 11 you don't get it back.  Isn't
18   that the plain reading of the contract?  You get 10 days to get
19   it back.
20           **MR. TWERSKY:**  Well, because what they're doing is
21   they're going against I think what's a policy.  I mean,
22   honoring -- a premium must be returned.  They didn't cover
23   anything.  Their contract says coverage -- it has an effective
24   date that they have to purchase, but it does say coverage
25   doesn't begin until the day of departure.

1      I think therefore -- I think this is something separate.
2 It would have been easy to say *and you're not entitled* or *we*
3 *handle refunds after 10 days in such and such manner*, whatever
4 manner that would have been --
5      **THE COURT:**  Well, but aren't they telling your
6 customers *you have 10 days to change your mind, but after that,*
7 *we keep the money*.
8      This is not a court of fair play.  Okay?  This is a court
9 of adequate disclosure, did you know what you were getting, was
10 it clear enough to a reasonable person?  So if you read a
11 contract that says for ten days you get your money back and it
12 doesn't say anything after that, I mean, why isn't the
13 reasonable reading *I better change my mind in ten days; other*
14 *than that, they are going to keep the money*.  What's wrong with
15 that?
16      **MR. TWERSKY:**  Right.  That would be -- but I think by
17 calling it -- in the certificate at least they do call it a
18 satisfaction guarantee, that only covers one reason I might --
19 might decide that this coverage isn't for me, but what about --
20 what about if I decide this coverage isn't -- I don't decide
21 anything about the coverage --
22      **THE COURT:**  No.  Are you saying satisfaction
23 guaranteed is a contract condition?
24      **MR. TWERSKY:**  Is -- I'm sorry.  I didn't hear.
25      **THE COURT:**  What does satisfaction guaranteed mean to

1  you as a contract term?

2  **MR. TWERSKY:** Well, I would think that what it means
3  is that's -- so if I don't want it because of a satisfaction
4  type of issue, then I can return -- then I have ten days to say
5  *you know what, I've read online, and I don't want this contract*
6  or whatever the case may be. Juxtapose that with unrelated to
7  satisfaction or even unrelated to ten days I don't travel,
8  well, if I don't travel, I'm not quite sure what the insurance
9  company --

10  **THE COURT:** Let me give you an analogy. You were
11  recently an undergrad, more recently than most people in this
12  room. When you applied to be an undergrad, you had to pay a
13  hundred bucks to every university you applied to. I know
14  because my kids are going through this process. They say, *This*
15  *is nonrefundable. You can't get it back. We hope you get in.*
16  *We hope you want to come here. But no matter what happens, we*
17  *keep the hundred.* So if you decided to apply to Stanford and
18  you changed your mind, they're not going to give you the
19  hundred dollars back.

20  Now, you don't need to see a statement on the website
21  saying that because they said it to you in one sentence, *this*
22  *is a nonrefundable hundred dollar fee.* How is that different
23  from this? It says you have ten days, after which you don't
24  get your money back. Now, they don't literally say *you don't*
25  *get your money back*, but why do they need to? They say you

1    have ten days to ask for it back.  Anybody in the world knows
2    that means on day eleven, you can't ask for your money back.
3         And *satisfaction guaranteed* is not a term, I'm sure, under
4    the case law or under the realities of this case intended to
5    gut the ten-day limitation on a return.  I will be pleasantly
6    and interestedly surprised if you find a case that says
7    *satisfaction guaranteed* blows out any of the terms and
8    restrictions on a contract proceeding.
9         Now, satisfaction guaranteed may be separately actionable
10   if you get your luggage lost and they don't pay or they pay
11   months later or whatever.  That's fine.  But that's not your
12   case.
13        So what is it that makes you think that on day eleven,
14   anybody who reads this policy would have a claim?  I mean, you
15   signed a contract, so it's right there in front of you.  You
16   don't like the terms, don't buy the product.  I mean, what is
17   it -- why do the plaintiffs in this case have a claim?
18            **MR. TWERSKY:**  I would agree with Your Honor that's
19   right, but -- well, if the claim is based largely -- because I
20   don't think the contract is abundantly clear that you don't get
21   it back after ten days or is abundantly clear about what
22   happens after ten days.
23        I agree with Your Honor that satisfaction guaranteed
24   within ten days -- I don't think I will find a case and I don't
25   think it's a term of art -- a term -- I don't think I will find

1    a case as far as satisfaction guarantee limiting something.
2    But I would think -- I would think -- you're talking about
3    regular people that are buying insurance, often it pops up when
4    you buy a Delta ticket, when you by an American Airlines
5    ticket.  They are reading the contract fast.
6         The person, in the context of reading this policy, I think
7    they would assume that they have ten days to return the policy
8    because of -- to return the policy because of a reason on their
9    end, meaning a reason -- something to do with the policy,
10   something about the guarantee, something -- they don't like the
11   policy, something is wrong with the policy, they decided it's
12   not for them.
13        But I think the context of canceling a flight or canceling
14   a trip and not going on -- to your place, I think that's
15   something entirely separate.
16        If you look at 41, it says *unless the contract says*
17   *otherwise,* I think that puts the onus on the insurance company
18   to make it very clear that honoring premiums will not be
19   returned if it doesn't say otherwise in the contract, and while
20   it does say what -- I just think that those are two separate
21   contexts.  I don't -- I don't see it as being the same issue as
22   an issue --
23            **THE COURT:**  Let me ask you this.  When do most people
24   buy -- don't they buy it within a week of taking their trip?
25            **MR. TWERSKY:**  I would -- I don't have statistics,

1   Your Honor, but I will go out there and say I think it's
2   probably different if it's business or if it's vacation.  I
3   would think you probably buy it a little longer, at least a
4   month -- from my own circumstance, I would think if you buy it
5   for a vacation, you buy it longer ahead of time.
6           **THE COURT:**  How much is it typically?  A couple
7   hundred bucks?
8           **MR. TWERSKY:**  Yeah, give or take, I think.
9           **THE COURT:**  Well, you may survive the filed-rate
10  issue.  I'm leaning that way.  I've got to do some more work on
11  it.  But I think you have some challenges.  Okay?
12      You have a written contract, and I don't find it
13  particularly ambiguous, and I don't see the allegation that
14  anybody was duped, misled or suckered in.  I mean, it's right
15  there.  It's not buried.  It's not unconscionable.  You haven't
16  argued any of that.  You haven't argued fraud in the inducement
17  or anything else.  So you're not taking the approach that
18  people were tricked, which is not even that great of an
19  approach, but you're not taking that approach.
20      So you're going to kind of live or die on the plain
21  language of the contract.  Now, if it's one-sided and unfair
22  and hurts people, that's an issue, but that's a marketplace
23  issue, not a legal issue.  The marketplace issue is don't buy
24  it.  The legal issue is if you had notice of it and you are
25  charged to have notice of it because it's a written document,

1   whether you read it or not.  Whether you're punching buttons
2   fast on your screen or not, you are charged under the law, as
3   you know, with having read it, and if it's not unconscionable,
4   then I'm will be curious to see how you persuade me that that
5   is not binding.  Okay.  That's it.  All right.
6        Do we need to set some dates?  Is that *yes*?
7            **MR. TWERSKY:**  Yes, Your Honor, we do.  All dates.
8            **THE COURT:**  All right.  Okay.  I don't bifurcate.
9   There will be no bifurcation.  Just one discovery period.
10  Bifurcation tends to be a waste of time.
11       You know what?  I will just have to send you the dates,
12  but I think a trial in the first quarter of 2017 is -- sounds
13  about right.  So I will work backwards from that.
14       Have you all started your initial disclosures and all
15  that?
16           **MR. TWERSKY:**  We --
17           **MS. JENKINS:**  We are scheduled to do so promptly,
18  Your Honor.
19           **THE COURT:**  Okay.  All right.  Get that under way.  I
20  will get an order out on this soon.
21       Now, is it too early to talk about dispute resolution?
22           **MR. TWERSKY:**  I think so, Your Honor.  I think that's
23  what we --
24           **MS. JENKINS:**  Your Honor, we already had a call with
25  the ADR office.

1  **THE COURT:** Okay.
2  **MS. JENKINS:** And we --
3  **THE COURT:** Do you want to do something with a
4  magistrate judge?
5  **MS. JENKINS:** Yes.
6  **THE COURT:** You do? Magistrate judge?
7  **MS. JENKINS:** Yes.
8  **THE COURT:** Do you have one in mind?
9  **MS. JENKINS:** We hadn't gotten that far in that
10 discussion. We were waiting to see whether or not our request
11 to be put into that grouping was accepted.
12 **THE COURT:** I will accept it.
13 **MS. JENKINS:** It was my understanding the
14 recommendation was going to you --
15 **THE COURT:** You want a magistrate judge. That's fine.
16 I will let that happen. Who would you like? You don't have to
17 have a preference, but if you have one, I'm happy to consider
18 it.
19 **MR. TWERSKY:** I have no preferences, Your Honor.
20 **THE COURT:** Are you sure?
21 **MR. TWERSKY:** Yes. We just wanted it to be a
22 magistrate, somebody with judicial authority.
23 **THE COURT:** Do you have any --
24 **MS. JENKINS:** Judge Laporte, Your Honor.
25 **MR. TWERSKY:** That works for us.

```
1            THE COURT:  All right.  I will send you to Judge
2   Laporte.  You don't have to do anything immediately.  You can
3   work it out with her, but she will be your settlement judge.
4   Okay.
5            MR. TWERSKY:  Thank you, Your Honor.
6            THE COURT:  Thank you.
7            MS. EVANS:  One clarification, Your Honor.  I think --
8            THE COURT:  You need to come up if you are going to
9   speak.
10           MS. EVANS:  I think you said that trial was going to
11  be set first quarter of 2017?
12           THE COURT:  Yes.  Is that what you proposed?
13           MS. EVANS:  Both of the proposed schedules are third
14  quarter, August --
15           THE COURT:  All right.  Maybe towards the end of the
16  second quarter.
17           MS. EVANS:  Okay.  Preferably September for me because
18  I have got a conflict in August and that was not put on here.
19  Sorry.
20           THE COURT:  The end of the second quarter, so it would
21  be like June.  All right.  Thank you.
22           MS. EVANS:  Thank you, Your Honor.
23           MS. JENKINS:  Thank you, Your Honor.
24           MR. TWERSKY:  Thank you, Your Honor.
25                (Proceedings adjourned at 10:56 a.m.)
```

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, March 16, 2016

*Pamela A. Batalo*
_____
Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter